

ENTERED
10/23/2018

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| DAVID W. AINSWORTH SR. | § | CASE NO: 17-20418 |
| Debtor(s) | § | |
| | § | CHAPTER  11 |

## <u>MEMORANDUM OPINION</u>

NewFirst National Bank filed a Motion for Relief From the Automatic Stay as to Real Estate against David W. Ainsworth, Sr., seeking relief from the Automatic Stay for cause, or in the alternative seeking adequate protection of its interest in Ainsworth's real property.  NewFirst claims it is entitled to foreclose on the interest it currently holds in a 51.80-acre tract owned by Ainsworth, located in Robstown, Nueces County, Texas.  Ainsworth claims that there does not exist cause to lift the automatic stay because NewFirst is adequately protected through the substantial equity cushion that exists on the subject property.  Ainsworth further proposes that under his proposed dirt-for-debt plan, NewFirst can be compelled to accept the 20-acre improved portion of the 51.80 acres in full satisfaction of its claim.  The valuation of both the 51.80 acres and the 20-acre improved portion of the 51.80 acres is contested.

NewFirst's motion for relief from the automatic stay is granted in part and denied in part.

## <u>Background</u>[1]

In 1995, David W. Ainsworth transformed Young Trucking, which he had purchased a year earlier, into Ainsworth Trucking.  At the time, the company was comprised of approximately 20 trucks and 25 employees.  (EFC No. 97 at 13).  At its peak, Ainsworth Trucking operated 50 trucks and had 100 employees.  As business grew, two separate entities

---

[1] A substantial portion of this background section was written in reliance on Ainsworth's proposed disclosure statement.  It is included solely for background, and this background section does not constitute a finding by the Court.

were spun off from the business—Ainsworth Trucking, LP; and Ainsworth Truck Leasing, LLC—collectively known as Ainsworth Trucking. (EFC No. 97 at 13).[2]   According to his proposed disclosure statement, Ainsworth's practice was to purchase property with the purpose of later leasing it to his corporations. (EFC No. 97 at 13).

Two years later, in 1996, Ainsworth leased, and later purchased, 10.06 acres in Robstown, Texas as part of his business for an office space and a "truck yard." (EFC No. 97 at 14). The purchase of the property was facilitated through a loan from First Capital Bank, whose loan officer later left and joined First Victoria National Bank. (EFC No. 97 at 14). Ainsworth subsequently transitioned with his loan officer and moved his debt to an account with First Victoria. (EFC No. 97 at 14).

In 2010, there was significant growth in the oil and gas industry in South Texas as part of "the discovery of significant oil and gas reserves in the Eagle Ford Shale area", which prompted Ainsworth to further expand his business. (EFC No. 97 at 14). As part of this expansion, Ainsworth made substantial changes to his business property from 2010 to 2013. (EFC No. 97 at 14).[3]  One of those changes was an additional purchase of "surrounding acreage with loans from several different banks." (EFC No. 97 at 14). A portion of that purchase was facilitated through a loan from First Victoria, and part of that real property eventually became the 51.80 acres at issue today.[4]

---

[2] Ainsworth Trucking LP, "handles contracting, logistics and driver training," while Ainsworth Trucking LLC, "owns trucking equipment and employs drivers." (EFC No. 97 at 13).

[3] The changes made by Ainsworth during that period of time "included an office building with specifications to withstand a category 5 hurricane and the addition of outlying buildings for truck services, warehousing, and storage." (EFC No. 97 at 14).

[4] In May 2012, Ainsworth's loan officer again moved from First Victoria to NewFirst National Bank. The debt was then moved from First Victoria to NewFirst. (EFC No. 97 at 14).

The 51.80 acres are composed of two separate properties—an improved 20-acre tract ("subject property") and a 30-acre tract ("excess land").   As part of the business's growth, Ainsworth added multiple metal buildings on the improved tract, and a large stabilized yard, approximately 15 acres of which is located on the improved part of the property.  (May 17, 2018 CBRE Appraisal at 17).  It is the valuation of the stabilized yard within the 51.80 acres that is most contested by the parties.

On November 27, 2013, David Ainsworth and Ainsworth Industrial Park, LLC, executed a Promissory Note in amount of $6,684,000.00 in favor of NewFirst National Bank, secured by the 51.80-acre tract located in Robstown, Nueces County, Texas.  (*See* ECF No. 83-5).  The parties contemporaneously executed a Loan Agreement.  (*See* ECF No. 83-6).  The Note is secured by a first lien Deed of Trust, Assignment of Rents Security Agreement and Financing Statement dated November 27, 2013, recorded in the Official Records of Nueces County, Texas. (*See* ECF No. 83-2).

NewFirst National Bank made two subsequent loans to David Ainsworth—an additional $472,157.23 on February 3, 2014, and an additional $1,200,000.00 on June 27, 2014.  (*See* ECF No. 83-8; EFC No. 83-11).   At the time the loans were made, the parties again contemporaneously executed loan agreements, and both notes were secured by two additional deeds of trust, with the 51.80-acre tract serving as collateral for both notes.  (*See* ECF No. 83-3; ECF No. 83-4; ECF No. 83-9; ECF No. 83-12).

In 2015, the price of oil and gas dropped significantly, making much of the drilling in the Eagle Ford Shale unprofitable.  In light of this price drop, Ainsworth's oil-related investments suffered "significant reductions in cash flow, valuations, and marketability".  (EFC No. 97 at 14).  As part of this economic downturn, Ainsworth Trucking ceased operating at a profit, and

Ainsworth was forced to reduce his workforce initially to 50 employees. (EFC No. 97 at 15). In the six months prior to the filing of the petition, Ainsworth Trucking had reduced its number of employees to 41. (EFC No. 97 at 15).

In late 2015, Ainsworth began marketing the assets of his companies in an effort to raise money; however, this was met with "only limited success". (EFC No. 97 at 15). During that time, Ainsworth placed the 51.80 acres on the market through Matthew Cravey Real Estate Services, Inc., a commercial real estate agency. (EFC No. 97 at 15). The listing price for the improved 20-acre portion of the real property was $9,800,000.00 ($82/SF). (*See* EFC No. 34-2; Collier's Appraisal, Exhibit 16 at 6). NewFirst's appraiser indicated in his report, and later confirmed at the July 16, 2018 hearing, that the listing price for the improved tract appeared to be reasonable in light of the "market data used in [his] report." (Collier's Appraisal, Exhibit 16 at 6; July 16, 2018 Hearing at 10:52 a.m.). However, to this date, no offers have been received for the property.

Ainsworth realized he could not meet his payment obligations, so on December 19, 2016, Ainsworth entered into separate loan modification agreements for each of his three loans with NewFirst National Bank, which extended their maturity dates. (*See* EFC No. 7; ECF No. 10; ECF No. 13). Additionally, counsel for NewFirst alleges that the bank has worked extensively with Ainsworth "to work out forbearance agreements . . . to allow time for the sale of the property." (July 16, 2018 Hearing at 9:39 a.m.) All three notes matured on March 31, 2017. Ainsworth has not made a payment on the notes since that time. (July 16, 2018 Hearing at 9:52 a.m.).

According to Ainsworth's plan of reorganization, between June 2017 and October 2017, NewFirst attempted to foreclose on the 51.80 acres on three separate occasions. (EFC No. 97 at

15).   Chip Voss, Chief Creditor Officer at NewFirst, however, testified at the July 16, 2018 hearing that the property has been posted for foreclosure on four separate occasions.  (July 16, 2018 Hearing at 9:52 a.m.).[5]   Both parties agree, however, that on one of those occasions, Ainsworth "filed an original petition and Request for Temporary Restraining Order and Temporary Injunction in the Nueces County Court at Law."  (EFC No. 97 at 15; *see* July 16, 2018 Hearing at 9:52 a.m.).  The Nueces County Court granted Ainsworth's request and issued a temporary restraining order on June 20, 2017, the same day the motion was filed.  (EFC No. 97 at 15).  NewFirst alleged that this was done solely for the purpose of delaying the foreclosure. (July 31, 2018 Hearing at 1:45 p.m.).  Ainsworth disputes this assertion, purporting that the claim was filed against the bank "for violating the terms of the restructured loan agreement."  (July 16, 2018 Hearing at 9:55 a.m.).

On October 2, 2017, Ainsworth filed a voluntary petition for relief under chapter 11 in this Court.  (EFC No. 82 at 2; EFC No. 97 at 3).

On April 27, 2018, Ainsworth filed a motion seeking approval of an installment agreement between Ainsworth Leasing and the Nueces County Tax Assessor-collector *nunc pro tunc*.  (*See* EFC No. 82-3).  Ainsworth previously leased real property to one of his corporations, Ainsworth Truck Leasing, LLC.  (EFC No. 82 at 2).  In accordance with the terms of certain lease agreements, Ainsworth's corporation, Ainsworth Leasing, is responsible for the payment of property taxes to Nueces County in connection with the real property leased.  (EFC No. 82 at 2). As business began deteriorating, Ainsworth Leasing became delinquent on property taxes owed to the county.   As a result, on March 28, 2018, Ainsworth negotiated and agreed to two

---

[5] Counsel for NewFirst alleged that "one of the dates coincided with Hurricane Harvey and the bank voluntarily pulled the foreclosure sale for humanitarian purposes."  (July 16, 2018 Hearing at 9:39 a.m.).

installment payment plans with Nueces County in order to become current on Ainsworth Leasing's past due property taxes. (*See* EFC No. 82-1; EFC No. 82-3). The installment agreements provide that: (i) Ainsworth Leasing will pay $552,358.44 to Nueces County divided into thirty-six monthly installments of $15,343.29, and (ii) Ainsworth Leasing will pay thirty-six monthly installments of $1,620.25 to Nueces County for a total of $58,329.00. (*See* EFC No. 82-1; EFC No. 82-3). Both installment agreements became effective as of April 15, 2018. (*See* EFC No. 82).

On May 9, 2018, NewFirst filed a motion for relief from the automatic stay pursuant to 11 U.S.C. §362(d)(1). (*See* EFC No. 83). In its motion to lift the stay, NewFirst alleges that cause exists to lift the stay, or alternatively that it is entitled to adequate protection for its interest in the property, given Ainsworth's failure to make monthly payments on the delinquent notes, pay delinquent property taxes, and escrow future taxes that will accrue in 2018. (*See* EFC No. 83). Ainsworth claims that cause does not exist to lift the stay given that NewFirst is adequately protected through a "substantial equity cushion in its collateral" and through Ainsworth's tax installment agreements with Nueces County. (*See* EFC No. 100).

On July 16, 2018, this Court held a hearing on NewFirst's motion to lift the stay, and on July 31, 2018, the Court heard closing arguments. On July 31, 2018, both parties stipulated to the following:

- NewFirst's secured claim for principal and interest due under all three notes totals $8,144,005.78, as of July 16, 2018.

- The unpaid Ad Valorem Taxes on the business property for 2016 are $139,124.75 and $148,661.00 in 2017. The total unpaid taxes for 2016 and 2017 are $287,785.75.

- The estimated 2018 ad valorem taxes for 2018 are $148,661.00, per the Nueces County Appraisal District.  (EFC No. 149 at 2).[6]

- Ainsworth, along with his affiliates, entered into a tax payment agreement regarding the 2016 and 2017 unpaid amounts with the Nueces County Tax Assessor-Collector.  The agreement covers property taxes and "ad valorem taxes on other parcels of real property [Ainsworth] or his companies own in Nueces County."  (EFC No. 149 at 2).

After the July 31, 2018 hearing, the Court took the matter under advisement to address the issue of whether to lift the automatic stay for the 51.80 acres in question.

## Jurisdiction

The District Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).  Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

## Analysis

Ainsworth's plan of reorganization proposes a partial dirt-for-debt plan.  Under the plan, Ainsworth seeks to transfer the improved portion of the 51.80-acre property—a 20-acre tract—to NewFirst in full satisfaction of its claim.  (*See* EFC No. 97 at 23; *see also* July 16, 2018 Hearing at 9:44 a.m.).  Ainsworth purports that the value of these improved 20 acres of land totals $9,300,000.00.  (*See* EFC No. 97 at 23).  The parties' valuations of the tract, however, differ considerably.  NewFirst argues that the 20-acre portion is worth less than the stipulated debt owed, which totaled $8,144,005.78.  (*See* EFC No. 149; *see also* NewFirst Exhibit 3).

---

[6] The total amounts owed for the ad valorem taxes for the years 2016, 2017, and 2018 are indicated on documents admitted at the hearing on the motion for relief of the stay.  (*See* NewFirst, Exhibit 15).

## I.   Motion for Relief from the Automatic Stay

The Court finds that NewFirst National Bank will not be adequately protected without retaining its interest as to the entire 51.80 acres, and even then, its protection is marginal. NewFirst, therefore, is not adequately protected in accordance with §362(d)(1) of the Bankruptcy Code.

"When a bankruptcy petition is filed, §362(a) of the Bankruptcy Code provides an automatic stay of actions taken to realize the value of the collateral given by the debtor." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, LTD*, 484 U.S. 365, 365 (1987). "Section 362(d) authorizes the bankruptcy court to grant relief from the stay '(1) for cause, including the lack of adequate protection of an interest in property of . . . [a] party in interest,' or '(2) with respect to a stay of an act against property,' if the debtor does not have any equity in such property (i.e., the creditor is unsecured) and the property is 'not necessary for an effective reorganization.'" *Id*. "A bankruptcy court may terminate, annul, lift or condition the Automatic Stay." *In re Choice ATM Enterprises, Inc*., 2015 WL 1014617 (N.D. Tex. March 4, 2015) (citing 11 U.S.C §362(a)(1), (6))).

## II.   Appraisers

A bankruptcy court is not bound by the expert reports or opinions of appraisers and may form its own opinion of value of the subject property. *In re Diamond Beach VP, LP*, 506 B.R. 701, 717 (Bankr. S.D. Tex 2014) (citing *In re Grind Coffee & Nosh, LLC*, 2011 WL 1301357 (Bankr. S.D. Miss. April 4, 2011)), *aff'd*, 551 B.R. 590 (5th Cir. 2016).  The court may accept an entire appraisal or give weight to only a portion of the report. *Id*. When competing appraisals are submitted, the court must consider portions of each report in order to arrive at a realistic market value. *Id*.  When two competent appraisals presented by qualified appraisers provide widely divergent value, heightened scrutiny is appropriate. *Id*.  "Courts must be wary of appraisals

which contain unsupported but important assumptions, valuations which place property with a unique and extraordinary location on par with an ordinary lot, and comparable sales that are so dissimilar that they are of little use in supporting the opinion of value. *In re Grind Coffee & Nosh, LLC*, 2011 WL 1301357, at *7 (Bankr. S.D. Miss. April 4, 2011) (citing *In re Belmont Realty Corp.*, 113 B.R. 118, 119–21 (Bankr. D.R.I. 1990)).

Prior to the July 2018 hearings on the motion to lift the automatic stay, both Ainsworth and NewFirst obtained appraisals for the 51.80-acres. Additionally, NewFirst hired an expert witness to assess both parties' appraisals. The appraisers sharply disagree on the valuation of the stabilized yard, 15 acres of which rests on the improved 20-acre portion of the property at interest. (May 17, 2018 CBRE Appraisal at 17). The crux of the valuation issue is the value of the stabilized yard. The parties' appraisals diverge regarding this improved portion of the property, with Ainsworth attributing a higher valuation to the property, while NewFirst claims there is an overbuilding component that substantially reduces the stabilized yard's value.

**A. The CBRE Appraisal (Ainsworth's Appraisal)**

Ainsworth's appraiser determined the total value of the 51.80-acre tract to be $13,150,00.00. (May 17, 2018 CBRE Appraisal at 49). He concluded that the highest and best use of the improved 20-acre tract was its continued use for industrial development. (May 17, 2018 CBRE Appraisal at 34). He further determined that the highest and best use of the 30-acre excess land was the development of a new industrial project. (May 17, 2018 CBRE Appraisal at 34).

Ainsworth's appraiser used two different appraisal methodologies in his report. The first methodology he used to appraise the business property was the Cost Approach method.[7] Using

---

[7] "The cost approach determines value of a property by estimating the current cost to construct a replacement for, or reproduction of, the existing structure, including an entrepreneurial incentive,

the Marshall Valuation Service (MVS), Ainsworth's appraiser determined that the direct and indirect building cost of the 51.80-acre tract was $10,770,00.00 ($90.59/SF). (May 17, 2018 CBRE Appraisal at 43). He valued the entrepreneurial profit at 10%, rendering a total building cost of $1,077,000.00 and determined the replacement cost to be $11,847,000.00. (May 17, 2018 CBRE Appraisal at 45).

The second methodology Ainsworth's appraiser used was the Sales Comparison Approach. He used five comparable properties, all of which were adjusted independently as needed for size, age, clear height, percentage of office space, and land to building ratio. (May 17, 2018 CBRE Appraisal at 48). The sale price per square foot for the comparable tracts of land ranged from $60.95 to $111.31 per square foot, with a mean and median of $75.88 and $67.37 per square foot. (May 17, 2018 CBRE Appraisal at 48). Ainsworth's appraiser determined the value of the improved 20-acre tract to be $78.22 per square foot. (May 17, 2018 CBRE Appraisal at 48). After determining there was no deferred maintenance or lease-up discount, he concluded the total value of the improved land was $9,300,000.00. (May 17, 2018 CBRE Appraisal at 48).

Ainsworth's appraiser's overall market valuation of the property was $9,300,000.00 for the 20-acre improved tract and $3,850,000.00 for the excess land. (*See* May 17, 2018 CBRE Appraisal, Letter of Transmittal; *see also* August 16, 2018 Hearing at 2:15 p.m.). He estimated approximately 12 months of marketing time for the property, using the value determined in his report. (July 16, 2018 Hearing at 2:15 p.m.).

The appraiser was unable to explain why the property has not yet been sold, even though it has now been fully exposed to the market.

---

deducting depreciation from the total cost and adding the estimated land value." *In re Diamond Beach*, 506 B.R at 715 (citations omitted).

## B. The Collier's Appraisal (NewFirst's Appraisal)

NewFirst's appraiser determined that the total value of the 51.80-acre tract to be $10,200,000.00 ($86/SF). (April 25, 2018 Collier's Appraisal at 2).[8] He determined that the highest and best use of the property "as-vacant is industrial development as demand warrants." (April 25, 2018 Collier's Appraisal at 36). He further concluded, similar to Ainsworth's appraiser's determination, that the highest and best use of the property as-improved is its continued industrial use. (April 25, 2018 Collier's Appraisal at 36).

NewFirst's appraiser also utilized two different valuation methods—the Cost Approach method and the Sales Comparison Approach. (April 25, 2018 Collier's Appraisal, Executive Summary Report). Using the Marshall Valuation Service, NewFirst's appraiser determined that under the Cost Approach method the direct and indirect building cost of the 51.80-acre tract was that of $5,997,762.00 ($50.45/SF). (April 25, 2018 Collier's Appraisal at 62). He valued the entrepreneurial profit at 10%, or $599,776.00, rendering a total replacement cost of $6,597,539.00 ($55.49/SF). (April 25, 2018 Collier's Appraisal at 62). NewFirst's appraiser determined the value of the property to be $10,300,000.00 ($87/SF). (April 25, 2018 Collier's Appraisal at 65).

To determine the value of the property under the Sales Comparison Approach, NewFirst's appraiser used six comparable properties, all of which were independently adjusted as needed for location, size, quality, condition, exposure, access, percentage of office space, and clear height. (April 25, 2018 Collier's Appraisal at 48). The sale price per square foot for the comparable tracts of land ranged from $70.00 to $101.00, with a median of $82.00 and an average of $84.00. (April 25, 2018 Collier's Appraisal at 49). NewFirst's appraiser's

---

[8] NewFirst's Appraiser only measured the cost of the total value of the 51.80 acres, as opposed to making two valuations—one for the 20-acre improved tract and another for the 30-acre excess land—as Ainsworth's appraiser did.

determination of the value of the land under the Sales Comparison Approach was that of $10,100,000.00 ($85/SF).  (April 25, 2018 Collier's Appraisal at 49).

NewFirst's appraiser's final valuation for the entire 51.80-acre tract was $10,300,000.00.  (April 25, 2018 Collier's Appraisal at 66).  He estimated the approximate marketing time for the sale of the property as 12 months or less.  (April 25, 2018 Collier's Appraisal at 66; July 16, 2018 Hearing at 11:00 a.m.).

### C.  NewFirst's Expert Witness

In addition to hiring an appraiser, NewFirst also employed an expert witness.  NewFirst's expert found that both reports appeared to be "reasonable, complete, adequate, accurate and relevant."  (NewFirst Exhibit 17, Whitmer Report at 1, 4).  He determined that both valuations "appraised the vacant land at $20,000 per acre" and that "[b]oth had reasonable comparables for the value conclusion."  (NewFirst Exhibit 17, Whitmer Report at 7).  NewFirst's expert, concluded, however, that both reports failed to consider one material element—the property's functional obsolescence.[9]  (NewFirst Exhibit 17, Whitmer Report at 1, 4).

In evaluating the individual reports, NewFirst's expert concluded that the total value difference between the two reports was $2,950,000.00.  (NewFirst Exhibit 17, Whitmer Report at 7).  He attributed this large difference in valuation to the appraisal of the stabilized yard.  According to NewFirst's expert's calculations, Ainsworth's appraiser's stabilization valuation was of $5,754,851.00 and NewFirst's appraiser's valuation of the same was of $3,495,509.00—

---

[9] Functional obsolescence has little to do with actual obsolescence.  It is an appraisal term of art to indicate that the property has been improved at a cost that exceeds its present function.  In this case, the stabilized yard was built to a standard that appears to far exceed its functional requirements.  It is built to a highway standard, when a stabilized yard can function well when built at a far lower cost.  A buyer is unlikely to pay for this excess cost.  The Court will refer to this term as "overbuilding" of the subject property.

rendering a difference in valuation of the stabilized yard of approximately $2,259,343.00. (NewFirst Exhibit 17, Whitmer Report at 7).

The Court found both appraisers credible. In addition, the Court found NewFirst's appraiser to be a credible expert witness. The Court does not agree with any one analysis in its totality but will consider portions of each in arriving at a valuation.

### III. Valuation of the Subject Property

#### A. The Stabilized Yard

In order to properly assess whether NewFirst's interest in the 51.80 acres is adequately protected, it is important to note its features. Specifically, it is vital to analyze the improved 20-acre tract at issue in the proposed dirt-for-debt plan. The subject property has "multiple metal buildings," consisting of "a truck service garage, a pipe inspection/threading building, a dry storage building, a paint shop, a san[d] blast shop, and [an] equipment storage building." (Collier's Appraisal, Exhibit 16, letter of transmittal). There are seven buildings on the improved property. (July 16, 2018 Hearing at 2:02 p.m.). The stabilized portion of the property extends both into the 20-acre improved land and the 31 acres of excess land. Ainsworth claims that approximately 39.34 acres of the 51.80-acre tract is composed of stabilized yard and is used for pipe storage. (May 17, 2018 CBRE Appraisal at 17). He further alleges that 15 of the 39.34 acres of stabilized yard are part of the 20-acre improved tract. (May 17, 2018 CBRE Appraisal at 17).

Ainsworth asserts that part of what lends the improved 20-acre tract considerable value is the stabilized yard—an assertion that NewFirst directly disputes. Ainsworth provided his appraiser with information on the stabilized yard that was included in the overall valuation of the

property.  (*See* May 17, 2018 CBRE Appraisal at 17).[10]  Ainsworth asserts that the stabilized area "was built up to a 3-foot crown with virgin fill dirt, covered with geo grid for stabilization, covered with [a] caliche base compacted to a thickness of 9 inches and finally topped with two course asphalt."  (May 17, 2018 CBRE Appraisal at 17).  Ainsworth testified that the stabilized yard was built according to the Standard Specifications for Construction and Maintenance of Highways, Streets and Bridges used by the Texas Department of Transportation ("TxDOT Specifications").  (July 16, 2018 Hearing at 3:26 p.m.; *see* Ainsworth's Exhibit 5).  Ainsworth indicated that he built the stabilized yard in this manner, because of the possible "wear and tear on the pipeyard [as a product of] the heavy loads" that would inevitably travel across the stabilized yard.  (July 16, 2018 Hearing at 3:26 p.m.).  He testified that his goal was to make the pipeyard last and avoid any "ruts and potholes" that most pipeyards develop over time.  (July 16, 2018 Hearing at 3:26 p.m.).  Ainsworth further added that as of the date of the hearing, there was no deferred maintenance on any of the buildings.  (July 16, 2018 Hearing at 3:27 p.m.).

The Court accepts this testimony as true in all respects.  However, the testimony does not demonstrate that there is a market for a stabilized lot built to a "gold standard."

NewFirst's appraiser testified at the July 16, 2018 hearing that the cost of replacing the stabilization is $2.33 per square foot.  (July 16, 2018 Hearing at 10:31 a.m.).  NewFirst's appraiser found that the stabilized yard had depreciated by 25% at the time of the appraisal. (July 16, 2018 Hearing at 10:32 a.m.).  He further testified that, although not directly addressed in his report, there was an overbuilding component to the stabilization of the property, which would decrease his overall valuation of the property in retrospect.  (July 16, 2018 Hearing at 10:23 a.m.).  NewFirst's appraiser, however, did not allot a specific amount of devaluation to this

---

[10] Ainsworth's appraiser noted several extraordinary assumptions in his report—information provided by Ainsworth.  (May 17, 2018 CBRE Appraisal, Executive Summary at vii).

overbuilding component.  (July 16, 2018 Hearing at 10:25 a.m.).  He also noted in his report that "no major items of observable deferred maintenance exists."   (April 25, 2018, Collier's Appraisal at 26).

Ainsworth's appraiser testified that he considered the overbuilding factor of the improved property when making his evaluations of the property.  (July 16, 2018 Hearing at 2:16 p.m.).[11] He attested that he did not include any information or valuation on overbuilding, however, because he "did not see provable evidence" of overbuilding.  (July 16, Hearing at 2:16 p.m.). NewFirst's expert noted that Ainsworth's appraiser's valuation of the stabilized yard totaled $2,469,852.00, attributing a value of $3.28 per square foot to the improved 20-acre tract and a value of $2.49 per square foot to the excess land.  (NewFirst Exhibit 17, Whitmer Report at 7). Ainsworth's appraiser calculated a depreciation percentage of 24.00% to the stabilized yard. (May 17, 2018 CBRE Appraisal at 41).

NewFirst's expert witness made no valuation conclusions of his own, but rather evaluated both appraisals.  (July 16, 2018 Hearing at 2:07 p.m.).  He testified that both reports "set forth a report that met the standards"; however, he highlighted their lack of valuation of overbuilding present in the property.  (July 16, 2018 Hearing at 11:31 a.m.).  He noted that the property was "very well laid out, and very well designed for the Ainsworth business," but found that the overbuilding decreased the property's value (compared to a cost approach) even though it was properly built.  (July 16, 2018 Hearing at 11:31 a.m.).  Specifically, New First's expert noted that the layout of the buildings, created a "specialized property."   (July 18, Hearing 2018 at 2:02 p.m.).  He explained that with regard to industrial or commercial buildings, "the more there are

---

[11] Ainsworth's appraiser appraised the property on three separate occasions—September 2015, January 2017, and May 2018.  (July 16, 2018 Hearings at 2:14 p.m.).

design elements that are specific to the operation [such as] buildings built for a particular business, the more likely that there is functional obsolescence . . . ." (July 16, 2018 Hearing at 2:02 p.m.).

In defining functional obsolescence, NewFirst's expert stated that it "means that the properties (buildings) would not likely be sold off to individual users but would be sold for a similar trucking facility, [and t]hat this is unlikely given the exact nature of the use they were built for." (NewFirst Exhibit 17, Whitmer Report at 1, 4). In other words, NewFirst's expert suggests that the value of the improved property is lower than appraised by either Ainsworth's appraiser or NewFirst's appraiser, given the unlikelihood that another buyer would need and purchase the property at the premium otherwise implicit in its overbuilt status.

As noted earlier, NewFirst's expert reported that the difference in valuation of the stabilized yard is $2,259,343.00. (NewFirst Exhibit 17, Whitmer Report at 7). In his report, NewFirst's expert addressed a discrepancy in the CBRE report, created by Ainsworth's appraiser, finding that two different numbers were used to appraise the value of the stabilized yard in the improved tract and in the excess land.[12] (*See* NewFirst Exhibit 17, Whitmer Report at 7). He noted that the "difference is narrowed if one uses the $2.49 [price per square foot] that was [used] in the CBRE report for the excess land stabilization." (NewFirst Exhibit 17, Whitmer Report at 7). Regardless of the discrepancy in the CBRE report, however, the valuation difference of the stabilized yard between the two reports is still great.

---

[12] NewFirst's expert noted that the valuation of the stabilization for the improved portion of the land is determined using $3.28 price per square foot, and the valuation of the stabilization found in the excess land is calculated using the figure of $2.49 price per square foot. (NewFirst Exhibit 17, Whitmer Report at 7).

**B.  The Comparable Sales Approach**

In evaluating the subject property, both Ainsworth's appraiser and NewFirst's appraiser used the cost approach and the sales comparison approach.  The Court finds that the cost approach is not the appropriate method to use for the evaluation of the subject property, because the cost approach is not suitable for measuring cost when the property is built to a "gold standard" and therefore not of the kind that a prospective buyer would replicate.  In this case, Ainsworth's property is built exactly to the specifications of his particular business and would not likely be reproduced by a prospective purchaser.  Therefore, the Court looks to the sales comparison approach calculations for guidance in evaluating the Ainsworth property.

The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method.  *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001) (citing *Religious of the Sacred Heart v. City of Houston*, 836 S.W.2d 606, 615-617 & n.14 (Tex. 1992)).  The goal of the inquiry is always to find the fair market value—an appraisal method is only valid if it produces an amount that a willing buyer would actually pay to a willing seller."  *Estate of Sharboneau*, 48 S.W.3d at 183.  Therefore, "[i]n the Fifth Circuit, a court conducting a valuation has broad leeway in its approach and is not tied to any particular methodology."  *In re Diamond Beach*, 551 B.R. 590, 609 (S.D. Tex. 2016).

"Courts have long favored the comparable sales approach when determining the market value of real property."  *Estate of Sharboneau*, 48 S.W.3d at 182.  "If the goal of an appraisal is to ascertain market value, then logically there can be no better guide than the prices that willing buyers and sellers actually negotiate in the relevant market."  *Id*.  "Under a comparable sales analysis, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property."  *Id*.

"The Fifth Circuit has found that the cost approach can overstate value." *In re Diamond Beach*, 551 B.R. at 613. "Both the Fifth Circuit and the United States Supreme Court have stated that the cost approach is inappropriate where reproduction of the asset being valued is unlikely." *Id*. Furthermore, "the cost approach is inappropriate absent complete ownership and a reasonable business reason to duplicate the asset." *Id*. "[T]he Supreme Court "rejected the cost approach as not bear[ing] on what a prospective purchaser would have paid." *Id*. (quoting *United States v. Toronto, Hamilton & Buffalo Nav. Co*., 338 U.S. 396, 403 (1949)). "Similarly, the Fifth Circuit rejected a valuation based on the cost approach where it was being used to value something that no one would ever reproduce." *Id*. (quoting *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 755 F.3d 236, 245 (5th Cir. 2014)).

The Court finds NewFirst's expert's findings as to the overbuilding of the property persuasive. Both Ainsworth's appraiser and NewFirst's appraiser agreed that Ainsworth's property was in great condition, and that he built his property to last. That fact is not in dispute. Ainsworth put a great amount of effort and thought into the buildings, which have concrete reinforced walls to protect against natural disasters, and a stabilized yard that is in line with Texas highway specifications with the intention that it withstand far more weight and traffic than a regular truck yard. (*See* EFC No. 97 at 14; *see also* July 16, 2018 Hearing at 3:26 p.m.). Ainsworth built his property with the purpose of growing and keeping his business for years to come. In doing so, Ainsworth spent a great amount of money.

This does not mean, however, that a buyer in an arms-length transaction would pay what Ainsworth spent in building the improved property he now owns. The money invested in the subject property was not invested out of necessity, but rather out of Ainsworth's desire to create an above average stabilized yard that he would continue to own and manage for an indefinite

amount of time.  Therefore, although the buildings and the stabilized yard are valuable in their current form, it is unlikely that a buyer in an arms-length transaction would pay their full value, since they were uniquely built to Ainsworth Trucking's specifications, rather than as a potential bargaining point in a future sale of the property.

Accordingly, cost is not the appropriate indicator of value in this situation.  There is no question that Ainsworth's property is unique in nature.  NewFirst's appraiser testified to this fact, finding that the layout is both unique and well-done.  It would not, however, make reasonable business sense to reproduce the asset being valued.  A prospective purchaser has no incentive to recreate what Ainsworth has built, because it is particular to Ainsworth's business' needs, and not for potential purchasers in the trucking and pipe storage business, who would be unwilling to fully pay for buildings who can withstand a category 5 hurricane and a stabilized yard built to Texas Highway specifications.  The best indicator of value for the marketplace is what a willing buyer would actually pay to a willing seller.  The comparable sales approach, therefore, serves as a better guide to determining the correct valuation of the property.

Using the sales comparison approach, Ainsworth's appraiser determined that the value of the improved tract was of $9,300,000.00 ($78.22/SF).  (May 17, 2018 CBRE Appraisal at 48). He further found that the value of the entire 51.80 acres was of $13,150,00.00.  (May 17, 2018 CBRE Appraisal 49).  NewFirst's appraiser, who valued the 51.80 acres as a whole, determined that the sale price for the entire property using the same methodology was of $10,100,000.00 ($85/SF).  (April 25, 2018 Collier's Appraisal at 49).

Unfortunately, both appraisers inappropriately included an inflated value of the property in their sales comparisons to reflect the overbuilt nature of the property.[13]  This error infected both market value appraisals with the same problem that overstated that value based on the cost approach.

NewFirst's expert witness testified that the range of discount that would reasonably be applied to the gross value of the subject property in order to account for the overbuilding component is between 18-28% of the total value.  (July 16, 2018 Hearing at 2:08 p.m.).  Taking Ainsworth's appraiser's valuation of the 20-acre tract and discounting the overbuilding component by both 18% and 28% provides a range of $6,696,000.00–$7,626,000.00.  Using the same discount rate for Ainsworth's appraiser's valuation of the entire 51.80-acre tract renders a range of $8,468,000.00-$10,783,000.00.  Doing the same for the value conclusion provided by NewFirst's appraiser as to the entire 51.80 acres, provides a range of $7,272,000-$8,282,000.  As mentioned previously, the parties stipulated as to the amount owed to NewFirst, which is $8,144,005.78, principal and interest for all three notes as of July 16, 2018.

It is clear from these valuations that NewFirst would not be adequately protected if it were to only retain an interest as to the 20-acre improved tract as provided for in the dirt-for-debt proposal.  It is also evident that, in discounting the overbuilding component from the total amount as to the 51.80 acres, NewFirst is only marginally protected as to its interest in the full 51.80 acres.

---

[13]  NewFirst's appraiser made upward adjustments in his comparable sales approach, while Ainsworth's appraiser using the same methodology largely based the price per square foot of the property on "the subject's characteristics, including good condition and quality, the presence of nearly new metal buildings, and a large stabilized yard . . . ."  (*See* April 25, 2018 Collier's Appraisal at 48; *see also* May 17, 2018 CBRE Appraisal at 48).

### IV. Conditioning the Stay

Adequate protection may be provided under Section 362 through a cash payment or periodic cash payments, an additional or replacement lien, or any relief that will "result in the realization by such entity of the indubitable equivalent" of their interest in the property "to the extent that the stay . . . results in a decrease in the value of such entity's interest in the property." *Timbers of Inwood Forest Associates, LTD*, 484 U.S. at 370.  In other words, adequate protection may be used to give either money, a lien on other property, or any other remedy that would allow for protection.  "It is common ground that the 'interest in property' . . . includes the right of a secured creditor to have the security applied in payment of the debt upon the completion of the reorganization, and that that interest is not adequately protected if the security is depreciating during the term of the stay." *Id.*

In this case, a depreciation in value of NewFirst's interest arises because its interest is subject to the continuing, senior liens for ad valorem taxes.  Under Texas law, a tax lien on real property takes priority over "the claim of any creditor of a person whose property is encumbered by that lien." TEX. TAX CODE ANN. § 34.05(b)(1).  The real property taxes owed by Ainsworth, therefore, take priority over NewFirst's security interest in the 51.80 acres.  A depreciation risk that a junior lien holder runs, such as NewFirst, is that senior liens, here the property taxes, will continuously accrue, thereby reducing NewFirst's interest in the property.  Consequently, in order to adequately protect NewFirst's interest in the 51.80 acres, Ainsworth must make adequate protection in payments in an amount equal to that depreciation.

The parties stipulated on July 31, 2018, that the ad valorem taxes on the business property remained unpaid for the years 2016 and 2017 in the amounts of $139,124.75 and $148,661.00, respectively.  (EFC No. 149 at 2).  This totals $287,785.74 in unpaid taxes for 2016 and 2017.  (EFC No. 149 at 2).  Ainsworth negotiated two separate agreements with Nueces

County as to the delinquent 2016 and 2017 taxes. (*See* EFC No. 82-1; EFC No. 82-3). The agreements provide for a payment of $16,963.54 a month for a period of thirty-six months, effective April 15, 2018. (*See* EFC No. 82; EFC No. 82-1; EFC No. 82-3).[14]

The parties also stipulated that the estimated 2018 ad valorem taxes are at least $148,661.00, per the Nueces County Appraisal District (EFC No. 149 at 2). These taxes will become due January 2019. There is no escrow in place for the 2018 taxes.

NewFirst's interest in the 51.80 acres is junior to that of the property taxes. As taxes continue to accrue on the subject property, NewFirst's interest in the 51.80 acres decreases, thereby also reducing its equity cushion. In light of these unpaid taxes, Ainsworth must make adequate protection payments to NewFirst in the amount of $12,388.42 per month in order to protect its interest in the property.

Unless a plan is confirmed providing for different treatment, Ainsworth must comply with the following:

- NewFirst must be paid in full not later than **April 25, 2019**. Presumably, this will be from a sale of all or a portion of the property. April 25, 2019 is 12 months from the date of the last appraisal. Both NewFirst's appraiser and Ainsworth's testified that 12 months or less was an appropriate time for the sale of the property. (*See* July 16, 2018 Hearing at 11:00 a.m.; *see also* July 16, 2018 Hearing at 2:15 p.m.).

- Ainsworth must maintain insurance on the property. There is currently no evidence that Ainsworth has stopped paying his insurance. (*See* July 31, 2018 Hearing at 1:49 p.m.).

- Ainsworth must deposit $12,338.42 into escrow with NewFirst, each month starting 30 days following entry of this Memorandum Opinion.

With respect to the balance of NewFirst's request for relief from the automatic stay under §362(d)(2), the Court concludes that there is some equity in NewFirst's collateral. Both a lack of

---

[14] The Court added the amounts from the two separate agreements discussed above in order to arrive at the total monthly amount.

equity and lack of necessity for an effective reorganization must be shown for relief from the automatic stay under §362(d)(2).  However, it has shown a future diminution in value that places its secured position at substantial risk.  Adequate protection of its interest is appropriate.

### Conclusion

The Court grants NewFirst's Motion for Relief From the Automatic Stay in part and denies it in part.  If Ainsworth fails to maintain the adequate protection required by this opinion, the stay will terminate without further Court order.

The Court will issue an Order consistent with this Memorandum Opinion.


SIGNED **October 22, 2018.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE